UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES ) | |
| ) | No. 1:14-CR-00326-2 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| JOHN COLETTI ) | |
| ) | |

MEMORANDUM OPINION AND ORDER

Back in 2019, John Coletti was sentenced to serve 30 months in federal prison for his role in a multimillion-dollar fraud scheme. R. 348, Sentencing Order.[1] After receiving a diagnosis of skin cancer, he sought and received a series of extensions on the surrender date to undergo treatment and reconstructive surgery. With his surrender date now set for January 3, 2022, Coletti has filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), asking this Court to reduce his sentence to a non-custodial one. R. 444, Def.'s Mot. The government opposes the request. R. 453, Gov't. Resp. For the reasons discussed in this Opinion, the Court denies Coletti's motion.

## I. Background

In October 2018, John Coletti pled guilty to one count of making a false statement, 18 U.S.C. § 1001. R. 301, Plea Agreement ¶ 5. The crime arose out of his job as a sales representative for a company called ContinuityX Solutions, which was run by David Godwin (the then-CEO, but now Coletti's co-defendant). *Id.* ¶ 6 at 2–3.

---

[1]Citations to the record are noted as "R." followed by the docket number.

ContinuityX was a computer and telecommunications services provider. *Id.* ¶ 6 at 3. In November 2012, Godwin asked Coletti to join a conference call and lie to Victim Company 2 about ContinuityX's cashflow, to convince the company to do business with ContinuityX. *Id.* First, Godwin emailed Coletti a copy of a fraudulent invoice showing that "Telecommunications Company B owed ContinuityX over $8 million." *Id.* Coletti knew the invoice was false and that Telecommunications Company B did not, in fact, owe millions to Continuity X. *Id.* But he nevertheless agreed to Godwin's request that he join a call later that day and tell staff from Victim Company 2 that "the invoice was genuine and the money was owed." *Id.* Partially because of Coletti's representations on that call, Victim Company 2, together with Victim Company 1, advanced six million dollars to ContinuityX. *Id.* ¶ 6 at 4. That money was never repaid, and the victim companies lost those six million dollars. *Id.*

David Godwin and ContinuityX engaged in other illegal dealings, and by 2013, the FBI was investigating the case. Plea Agreement ¶ 6 at 2. On July 2, 2013, Coletti was interviewed by an FBI agent in Los Angeles. *Id.* When the agent asked Coletti about the fraudulent invoice, Coletti falsely stated that he only learned of the invoice in 2013, even though he knew that really, he had known about it back in November 2012. *Id.* at 4. This false statement is the basis of Coletti's conviction under 18 U.S.C. § 1001. *Id.* ¶ 5.

The pre-sentence investigation report prepared by the Probation Office, which the Court adopted without changes at sentencing, includes additional details about Coletti's role in Godwin's fraud schemes. Egregiously, on two occasions, Coletti posed

2

as an employee—that is, literally posed as a different person—of one of the victim companies on a phone call with another victim company to cover up the fraud. R. 316, Presentence Investigation Report (PSR) ¶ 16 (under seal); R. 349, Statement of Reasons at 4 (under seal).

On April 18, 2019, this Court sentenced Coletti to 30 months of imprisonment and one year on supervised release. Sentencing Order. In reaching this decision, the Court noted the seriousness of the crime of lying to law enforcement. R. 358, Sentencing Tr. at 25:2–14. The Court also noted, in aggravation, the seriousness of the crime that Coletti sought to cover up by lying to the FBI: a fraud that caused six million dollars in loss to two companies. *Id.* at 25:15–20. The Court acknowledged Coletti's lack of criminal history, and noted that he appeared to understand the seriousness of the crime and did not need much specific deterrence. *Id.* at 25:21–26:1. But the Court also noted that Coletti was involved in criminal conduct with Godwin for months on end, and without reluctance. *Id.* at 26:8–27:25. Although Coletti's role was minor in comparison to the roles of his co-defendants (Godwin and Anthony Roth), it was still "a role that was necessary to keep this scheme going." *Id.* at 27:8–15. General deterrence was thus a major consideration in arriving at the sentence imposed. *Id.* at 27:13–23. Coletti was originally ordered to surrender for the custodial part of his sentence on January 14, 2020. Sentencing Order.

On January 9, 2020, Coletti filed the first of what would become nine motions to extend his surrender date, driven by an unfortunate and doubtless frightening diagnosis of skin cancer, and the ensuing treatment and recovery involved. R. 395.

3

When the first motion was filed, Coletti was awaiting more definitive biopsy results. *Id.* ¶ 3; R. 397. Those results unfortunately came back positive for cancer, and Coletti filed a second request so that he could undergo surgery to remove the cancerous area. R. 400. That motion was granted to April 28, 2020. R. 402. And so on. Suffice to say that the Court continued to grant Coletti's requests as he underwent the required surgeries, which were delayed several times due to the COVID-19 pandemic. By November 23, 2020, all of the skin cancer had, thankfully, been removed, but Coletti still needed to undergo reconstructive surgeries in the wake of those excision surgeries. R. 449. In his ninth and most recent unopposed motion to extend his surrender date, filed on August 30, 2021, Coletti reported that his doctor would finish reconstructive surgeries by the end of December 2021, and asked to begin his custodial sentence on January 3, 2022. R. 479 ¶¶ 2–3. On the current record, then, it appears that Coletti is now cancer-free.

In October 2020, Coletti filed this motion to modify his sentence to home confinement. R. 444. The government opposes the motion. R. 453, Gov't. Resp.

## II. Analysis

In seeking the reduced sentence, Coletti invokes 18 U.S.C. § 3582(c)(1)(A)(i). That statute permits a defendant to petition the Court to modify a term of imprisonment if "extraordinary and compelling reasons warrant such a reduction," and if the modification would be consistent with the sentencing factors in 18 U.S.C. § 3553(a) and the applicable Sentencing Guidelines policy statements (if any). Before petitioning the Court, a defendant must exhaust administrative remedies with the Bureau of

4

Prisons (commonly known as the BOP), by first asking the warden of the defendant's facility to request the sentence modification on the defendant's behalf, and then either waiting 30 days or exhausting appeal remedies of the warden's denial within the BOP. 18 U.S.C. § 3582(c)(1)(A). In this case, the government disputes that Coletti has exhausted his administrative remedies—indeed, the government contends it is too early for Coletti to do so. Gov't. Resp. at 9–13. The government further disputes that Coletti has demonstrated extraordinary and compelling circumstances warranting a modification of his sentence, or that the § 3553 factors would justify a sentencing reduction. *Id.* at 13–15. The Court will address each issue in turn.

## A. Exhaustion

The most difficult question presented by the motion is whether Coletti has exhausted his administrative remedies. Although the exhaustion requirement for compassionate-release motions is not a subject matter jurisdiction hurdle, it *is* a mandatory claim-processing rule that federal courts must enforce if invoked. *United States v. Sanford*, 986 F.3d 779, 782 (7th Cir. 2021). Coletti argued in his motion that even if the Court found that he had not exhausted his remedies, the requirement could be set aside. Def.'s Mot. at 4. After the parties finished briefing this motion, however, the Seventh Circuit spoke definitively on the issue, and there is no room for disagreement: "We have not yet directly addressed—that is, not in a published opinion— whether the exhaustion requirement is a mandatory claim-processing rule and therefore *must* be enforced when properly invoked. Several of our sister circuits have held

5

that it is. ... We agree." *Sanford*, 986 F.3d at 782 (emphasis in original). So Coletti must exhaust his remedies before he can request a modification of his sentence.

The thorny issue is whether Coletti can request compassionate release *before* beginning to serve his sentence. The government says he cannot, while he maintains that he can. Gov't. Resp. at 9; Def.'s Mot. at 3. No appellate court has spoken on this question yet. Nor does the statute itself explicitly address it. The Court notes, however, that the statute does not seem to preclude a request from someone like Coletti. The exhaustion requirement is set forth, in full, as follows, with special emphasis on the authorization to file a compassionate-release motion after asking the warden to do so:

> The court may not modify a term of imprisonment once it has been imposed except that—in any case—the court upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or *the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier, may reduce the term of imprisonment ....

18 U.S.C. § 3582(c)(1)(A) (emphasis added). The government argues that the requirement to ask the warden to move for compassionate release means that "the plain text of the statute contemplates that a defendant seeking compassionate release is in the custody of the BOP." Gov't. Resp. at 9. In an attempt to fulfill the exhaustion requirement, Coletti sent a letter to the warden of Federal Correctional Institution (FCI) Lompoc, where he is assigned to report, in January 2022, for his period of incarceration. Def.'s. Mot. at 3; R. 445, Letter to Warden. As far as the record shows, this

6

warden is (as a factual matter) indisputably the right person for Coletti to ask for compassionate release—at least after he surrenders. But does the statute even permit the commencement of the exhaustion process before the defendant surrenders into custody?

The district courts that have confronted this problem are split. The government accurately cites to several cases in which district courts have held that § 3582 does not allow a defendant to request compassionate release before surrendering into custody. Gov't. Resp, at 9–10. For example, the court in *United States v. Konny* reasoned that the "plain terms" of the statute require defendants to begin serving time before requesting compassionate release. 463 F. Supp. 3d 402, 404 (S.D.N.Y. 2020). District courts in New Jersey and Oregon have echoed this reasoning. *United States v. Picardo*, 2020 WL 6501730, at *2 (D.N.J. Nov. 5, 2020); *United States v. Staggs*, 2020 WL 7625229, at *3 (D. Or. Dec. 22, 2020). At least one court in this district has also expressed "reason for the Court to doubt that [a defendant] may seek compassionate release prior to his incarceration[,]" but declined to decide the issue because there were other grounds to deny the motion. *United States v. Nazer*, 458 F. Supp. 3d 967, 971 (N.D. Ill. 2020).

But a few courts *have* granted compassionate release to defendants who have not yet surrendered to federal custody. The government acknowledged and distinguished two of those cases, but they are still worth discussing. In one, a defendant named Gonzalez was temporarily housed in the county jail while she awaited designation to a federal facility where she could serve her time. *United States v. Gonzalez*,

7

451 F. Supp. 3d 1194, 1195 (E.D. Wash. 2020). Gonzalez's attorney contacted the BOP and asked "which office could process her compassionate release based on her medical condition." *Id.* The BOP told the attorney that nobody could process the defendant's request, because she "was not yet in a designated facility." *Id.* at 1195–96. The district court held that the defense counsel's attempt to get an answer was good enough to fulfill the exhaustion requirement. *Id.* at 1196. It is true, as the government points out, that Gonzalez was already being held in a form of custody, whereas Coletti is currently free. Gov't. Resp. at 10 n.2. But this is not a materially distinguishing fact— in both cases, the BOP would not, or did not, process a request for compassionate release because the defendant was not yet in the custody of a federal facility. Having said that, it is true that *Gonzalez* did not provide detailed reasoning for its decision. The same can be said about *United States v. Hambrock*, 520 F. Supp. 3d 827, 830 (E.D.Va. 2021)., in which the court held, without extensive explanation, that a defendant who had not yet surrendered into custody had nevertheless exhausted his administrative remedies by contacting the warden of the facility where he was due to surrender.

    A case from the early days of the pandemic offered a lengthier analysis on this question, ultimately deciding on narrow grounds that the defendant had exhausted his remedies before surrendering. The circumstances of *United States v. Austin* were unusual: Austin had already served 10 years in BOP custody, and then won a reduction in his sentence and had been released in 2017, only to see the Second Circuit vacate the sentence reduction in 2020, requiring him to surrender again on June 30,

8

2020. 468 F. Supp. 3d 641, 644 (S.D.N.Y. 2020). To exhaust his remedies, Austin had written to the warden of the facility where he had spent a decade of his life—but the warden did not reply. *Id*. The court compared Austin to "a defendant in a halfway house or in a medical facility" as opposed to a defendant who had not served any time. *Id*. The court noted the imminence of his new surrender date, and decided that Austin was, "*de facto*, in the same position as a defendant already in custody." *Id*. (emphasis in original). The court limited its holding to Austin's "narrow and exceptional situation," but in reasoning that applies equally well to any defendant with a looming surrender date, noted that requiring Austin to surrender before requesting compassionate release "would be a hypertechnical and inequitable result, more akin to a seventeenth-century battle of writs than to the mandate of modern law to render substantial justice." *Id*.

No doubt that if Congress explicitly required defendants to surrender before requesting relief under the statute, then courts would be bound to follow that mandate. It is true that there are textual clues pointing to the necessity of a surrender—but the statute is not explicit. One clue is that Section 3582 requires that the defendant make the compassionate-release "request" to "the warden of the defendant's facility." § 3582(c)(1)(A). So it does appear that, in order to even make a request, there must be a "defendant's facility." But after the defendant receives a designation to a facility, it might very well be reasonable to consider the designated facility as the "defendant's facility" in plain-meaning terms.

9

The other textual clue in Section 3582 has to do with adding a term of probation or supervised release after granting a sentence reduction. The statute authorizes district courts to reduce the term of imprisonment and then, if appropriate, "impose a term of probation or supervised release … that does not exceed the *unserved* portion of the original term of imprisonment," § 3582(c)(1)(a) (emphasis added). Arguably, the reference to an "unserved" portion of imprisonment means that there must be some portion that was *served*. But that would be a round-about way to declare that a surrender is required to start the exhaustion process; instead, that part of the statute directly speaks to the maximum length of the probation or supervised release, rather than a limit on exhaustion. So that textual clue too does not undermine the possibility of exhaustion before surrender.

In order to reach a fully informed opinion on this subject, ideally the parties would brief and analyze the administrative regulations that BOP has promulgated to implement the compassionate-release statute and, specifically, the statute's exhaustion process. The Court also would consider whether administrative deference is owed on this issue. Ultimately, however, there is no need to decide whether Coletti is eligible to even ask for compassionate release before surrendering, because even if he had surrendered, the specific facts and circumstances do not warrant a reduction of sentence.

### B. Extraordinary and Compelling Reasons

The first problem for Coletti is that there are no "extraordinary and compelling reasons" for a reduction. A court may modify a defendant's sentence only if it finds

that "extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). For the here and now, however, the Sentencing Guidelines only address motions filed by the Director of the BOP. USSG § 1B1.13. This is because defendants have only been able to file their own § 3582 release motions since 2018, when Congress passed the First Step Act, and the Sentencing Commission has not had a quorum to update its policy statements since then. *United States v. Gunn*, 980 F.3d 1178, 1179–80 (7th Cir. 2020). For motions filed by a defendant directly after exhausting administrative remedies, there are no applicable policy statements for the courts to follow, as the Seventh Circuit recently held. *Id.* at 1180. The Seventh Circuit also explained, however, that district judges should still look to the Sentencing Guidelines' definition of "extraordinary and compelling reasons" as a "working definition" for that term as applied to defendants filing their own compassionate-release motions. *Id.* Indeed, "a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused." *Id.*

So the analysis starts with the Sentencing Guidelines' definition of "extraordinary and compelling reasons." Generally speaking, the policy statement on compassionate-release motions filed by the BOP defines three types of extraordinary and compelling circumstances: the defendant's medical condition, the defendant's age, and the defendant's family circumstances. USSG § 1B1.13. There is also a catch-all clause for "other reasons" as determined by the BOP. *Id.* Here, Coletti grounds his

11

request on his age (60 when he filed the motion, now 61) and medical condition, which he says make him "particularly vulnerable" to COVID-19. Def.'s Mot. at 6.

Since the filing of Coletti's motion, however, COVID-19 vaccines have become widely available in this country, changing the approach to COVID-based compassionate release motions in this circuit. In July 2021, the Seventh Circuit held that because vaccines are available to federal prisoners, COVID-19 is no longer an "extraordinary and compelling reason" for immediate release from custody, unless the defendant "can show that he is unable to receive or benefit from a vaccine." *United States v. Broadfield*, 5 F.4th 801, 803 (2021). The Seventh Circuit has gone so far as to explain that it would be an abuse of discretion for a district court to find that COVID-19 is a sufficient reason to reduce a defendant's sentence in the absence of any specific finding that he is "medically unable to receive or benefit from the available vaccines." *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021). This includes defendants who have health conditions that increase their risk of contracting a severe case of COVID-19. *Id.* at 596–97 (affirming denial of compassionate release to defendant who suffered from diabetes, high blood pressure, and obesity). Moreover, an individual who refuses to get vaccinated based on "self-diagnosed skepticism about the COVID-19 vaccines" has not provided "an adequate explanation for remaining unvaccinated," and has thus not shown extraordinary and compelling circumstances warranting his release. *Broadfield*, 5 F.4th at 803.

Here, Coletti has presented no reason to think that he is medically unable to take, or benefit from, the vaccine. It is true that the Court must consider the combined

12

effect of Coletti's multiple health conditions that might raise his risk of severe COVID-19 infection, *United States v. Newton*, 996 F.3d 485, 489–90 (7th Cir. 2021), but in light of the available vaccines, this does not help him. Coletti mentions his age, 61, as a factor raising his risk. Def.'s Mot. at 1. Although the risk begins increasing for older adults in their fifties, increasing with each decade of life, the Centers for Disease Control and Prevention (CDC) has explained that the risk is highest for people 85 and over.*COVID-19 Risks and Vaccine Information for Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/aging/covid19/covid19-older-adults.html (last accessed Dec. 9, 2021). Also, the vaccines are highly effective for older adults: "People 65 and older who received both doses of either Pfizer or Moderna vaccines showed a 94% reduced risk of COVID-19 related hospitalization." *Id.* This underscores the reasoning of the Seventh Circuit in *Broadfield*—with vaccines available, the question is not whether a person has a risk factor, but whether he can receive the vaccine that would protect the defendant from the virus.

Somewhat more troubling is Coletti's recent bout of skin cancer. But it too does not rise to the level of an extraordinary and compelling reason. The CDC says that "[c]ancer patients and survivors may have a higher risk of getting COVID-19 and other infections." *Staying Well During COVID-19: A Guide for Cancer Patients and Their Caregivers and Family Members*, Centers for Disease Control and Prevention, https://www.cdc.gov/cancer/survivors/staying-well-during-covid-19.htm (last accessed Dec. 9, 2021). This is particularly important for patients undergoing chemotherapy, which weakens the immune system. *Id.* On the record before the Court, it

13

does not appear that Coletti received any chemotherapy. His motion for compassionate release refers exclusively to treatment through surgery—at the time of filing, he had "completed all biopsies and excision surgeries for suspected areas identified so far," and was awaiting four plastic surgeries to repair the damage. Def.'s Mot. at 1. Indeed, his excision surgeries and biopsies had been completed by November 23, 2020, leaving only reconstructive surgeries to be performed in 2021. R. 449. At this point, Coletti only needs to be monitored by a dermatologist every six months for a possible recurrence of cancer. Def.'s Mot. at 6. This is a modest level of follow-up care that the BOP should be able to provide.

Presumably, if Coletti's doctors had found more cancer in the past year, or prescribed a course of radiation or chemotherapy, Coletti would have alerted the Court in his most recent motion to extend his surrender date, R. 479, or filed a new motion based on that information. In the absence of any assertion like that, it is the Court's understanding that Coletti is currently cancer-free and nearly done with his surgical treatment. The CDC recommends that cancer patients and survivors obtain the COVID-19 vaccine. *Staying Well During COVID-19.* So again, in the absence of an assertion that Coletti medically cannot obtain or benefit from the COVID-19 vaccine, his status as a cancer survivor with an uncompromised immune system is not an extraordinary and compelling reason that would justify modifying his custodial sentence.

Finally, it is worth noting that Coletti's motion relied in part on high rates of COVID-19 and allegedly poor handling of the pandemic at the FCI Lompoc federal

14

penitentiary in 2020. Def.'s Mot. at 2. He argued that the prison's handling of the outbreak heightened his risk of contracting COVID-19. *Id.* More recently, at Lompoc, 297 staff members and 1802 inmates have been vaccinated against COVID-19, according to the BOP. *COVID-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Dec. 9, 2021). There are currently two confirmed active cases of the virus at Lompoc: one inmate, and one staff member. *Id.* The BOP reports a current population of 899 total inmates at Lompoc, so the number of vaccinations must include people who have been released since vaccinations began. *FCI Lompoc*, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/lof/ (last visited Dec. 9, 2021). FCI Lompoc is at Operational Level 2, which means one of the following is true: its medical isolation rate is between 2% and 7%; its facility vaccination rate is between 50% and 65%; or its community transmission rate is 50–99 per 100,000 over the past seven days. *BOP COVID-19 Operational Levels*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Dec. 9, 2021). These rates are comparable to many communities in the United States, and again, the vaccine provides significant protection against the virus.[2] Also, the BOP has instituted significant social distancing and masking requirements designed to protect inmates from the virus. *Id.* So even

---

[2]*See Covid Vaccinations in the United States*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total (last visited Dec. 9, 2021) (showing that 60.4% of the U.S. population is fully vaccinated); *United States COVID-19 Cases, Deaths, and Laboratory Testing (NAATs) by State, Territory, and Jurisdiction*, Centers for Disease Control and Prevention, https://covid.cdc.gov/covid-data-tracker/#cases_community (last visited Dec. 9, 2021) (showing high community transmission rates in most states, with national seven-day transmission rate of 247.7 cases per 100,000).

if Coletti is at a higher risk of contracting severe COVID-19 due to his health and age, serving his sentence at Lompoc might not significantly increase that risk. *See Broadfield*, 5 F.4th at 802. All in all, there are no extraordinary or compelling reasons to reduce his sentence.

### C. Section 3553 Factors

Even if Coletti had demonstrated extraordinary and compelling reasons for a reduction, the release motion still would have been denied after considering the § 3553(a) factors. The compassionate-release statute requires courts to consider the applicable factors set forth in Section 3553(a) before granting a request to modify a term of imprisonment. § 3582(c)(1)(A). In Coletti's case, the § 3553 factors weigh against granting his request, even if he had demonstrated extraordinary and compelling reasons to reduce his sentence.

The factors courts must consider in imposing a sentence include the following ones relevant to the Court's decision today:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>> …

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). On specific deterrence, the Court agrees with Coletti that he presents a low risk of recidivism, and that there is little need for his sentence to perform the task of specific deterrence or to protect the public from his future crimes. Def.'s Mot. at 5. But those factors already helped mitigate Coletti's original 30-month sentence. Coletti also suggests that if his sentencing were held today, the Court would consider his health in determining his sentence. *Id.* That is surely right. But as discussed above, given the existence of the vaccine and his current state of health, it does not provide grounds for modifying his sentence.

And Coletti overlooks other sentencing factors that readily weigh against excusing him from serving any term of imprisonment. First and foremost, as noted by the government, is the seriousness of his offense. Gov't. Resp. at 15. Coletti repeatedly participated in a brazen fraud scheme, personally contributing to two companies' combined loss of $6 million. He knowingly lied to further this fraud, including outright impersonating a supposed creditor of ContinuityX. Although he now understands the gravity of this crime—again, something that helped push the sentence down in the first place—his present understanding does not undo the effects of his misconduct. To punish such a serious crime with zero prison time would not

adequately reflect the nature of the offense and would undermine the goal of general deterrence.

Also, Coletti has two co-defendants in this case, and the Court must avoid unwarranted disparities among their sentences. *See* § 3553(a)(6). The scheme's mastermind, David Godwin, was recently sentenced to a term of 156 months of imprisonment. R. 511, Godwin Judgment. The other co-defendant, Anthony Roth, is scheduled for sentencing on February 2, 2022. R. 510. Based on the Probation Office's pre-sentence investigation report and Roth's offense conduct, it appears likely that Roth too will be sentenced to federal custody. R. 328, Roth PSR at 18 (under seal, noting guideline range of 108–135 months in custody); R. 327, Roth Sentencing Recommendation at 3 (under seal, recommending below-guidelines sentence of 48 months). As noted above, Coletti's role in the defendants' fraud scheme was arguably the most limited of the three, but it was still serious. Excusing him from serving any time in prison would thus create an unwarranted disparity between his punishment and that of his co-defendants.

Given the severity of Coletti's crime, and the need to avoid unwarranted disparities between co-defendants, the Section 3553 factors do not support a modification of Coletti's sentence as he requests.

### D. Eighth Amendment

Finally, Coletti argues that enforcing his custodial sentence during the COVID-19 pandemic would be cruel and unusual punishment in violation of the Eighth Amendment. Def.'s Mot. at 7. "A prison official's deliberate indifference to a

18

substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (cleaned up).[3] Under the Eighth Amendment, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* at 832 (cleaned up). When he filed his motion a year ago, Coletti argued that confinement in a federal prison would be a cruel and unusual punishment because family visits had been put on hold, inmates who felt unwell were put in isolation, and inmates were not able to participate in normal activities. Def.'s Mot. at 7. He also argued that his health conditions made his imminent incarceration cruel and unusual, because they meant confining him would "expose him to a serious risk of illness or death." *Id.* at 8.

As discussed above, vaccination rates are high and infection rates are low at FCI Lompoc, and the vaccine is available to Coletti, if he has not yet received it. Right now, the facility's operations are at "Level 2" modifications, according to the BOP website, and visiting has been suspended. *FCI Lompoc, supra*. Under Level 2 restrictions, inmates and staff are required to wear face coverings and social distance, and most programs' capacity is limited (though it appears some programming is available). *BOP COVID-19 Operational Levels, supra*. These policies are specifically

---

[3] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

designed to protect the safety of staff, inmates, and the public. *COVID-19 Coronavirus* home page.

The Court acknowledges that serving time during this pandemic is harder than it was before. But the BOP generally, and FCI Lompoc specifically, have taken significant steps to protect inmates from COVID-19, and are thus not in violation of the Eighth Amendment. Particularly now that a vaccine is available, it is generally not cruel or unusual to require defendants to serve prison time during the COVID-19 pandemic.

### III. Conclusion

John Coletti's motion for compassionate release is denied. The tracking status hearing of December 10, 2021, is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: December 9, 2021